# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### SOUTHERN DIVISION



**FILED**

JUL 1 6 2004

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.*<br>Spencer Greendyke, M.D.<br><br>Plaintiffs,<br><br>vs.<br><br>CNOS, PC<br><br>and<br><br>CNOS HOLDING CO., LLC<br><br>and<br><br>JOHN DOES (1 - 19)<br><br>and<br><br>DR. MICHAEL C. GENOFF<br><br>and<br><br>SIOUXLAND SURGICAL CENTER<br>LIMITED PARTNERSHIP<br><br>Defendants. | CIV. #04<br><br>**FALSE CLAIMS ACT COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL**<br><br><br>**FILED UNDER SEAL PURSUANT**<br>**TO 31 U.S.C. §3730(b)(2)**<br><br>**DO NOT PLACE IN PRESS BOX**<br><br>**DO NOT ENTER ON PACER** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

1.      This action is brought pursuant to U.S.C. §§3729 *et seq.* (hereinafter referred to as the "False Claims Act" or "F.C.A."). The claims arise out of false certifications as to the necessity for certain tests and services, claims for services which were not medically necessary or not provided, claims for fraudulent charges beyond those justified, and for improper kickbacks under applicable federal law and, specifically, U.S.C. §§ 1320a (hereinafter Anti-Kickback Statute or "A.K.S."). Included in these acts are the following:

- An arrangement whereby non-qualified individuals made false and fraudulent entries into the medical records of patients which entries were falsely certified by physician participants in the Medicare Program in violation of the F.C.A..

- An arrangement where awards were given to non-qualified participants for making false and fraudulent entries into medical records to increase the volume of Medicare utilization in violation of the F.C.A. and A.K.S.

- An arrangement whereby a space was purportedly "leased" for Thirty Thousand Dollars ($30,000.00) a year by a pharmaceutical company though it never actually utilized the space in violation of the A.K.S.

- A physician who performed unnecessary procedures and coded at levels beyond those justified and fraudulently misrepresented the provision, nature, and extent of services provided to increase charges to Medicare in violation of the F.C.A.

- The routine coding of referred patients as "consults" in order to fraudulently increase reimbursement regardless of whether there was a transfer of care.

- Arrangements which resulted in the submission of claim forms to Medicare which forms were either false and fraudulent because of their content or which were rendered false and fraudulent under the F.C.A. because they arose out of "kickbacks" under the A.K.S.

2.  As required by the False Claims Act, 31 U.S.C. §3730(b)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of South Dakota a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to Relator at the time of this filing establishing the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

## JURISDICTION AND VENUE

3.  This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

4.  Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3279 *et seq.* and complained of herein took place in this district, and is also proper pursuant to 28 U.S.C. § 1391(b)-(c) because at all times material and relevant, defendants transacted business in this District and many of the transactions and occurrences took place in this district.

## PARTIES

5.      Plaintiffs are Dr. Spencer Greendyke, (hereinafter referred to as "Relator) who is a citizen of the United States and at times relevant hereto was a resident of the State of Iowa, providing services in the States of South Dakota and Iowa, and the United States of America (hereinafter referred to as U.S.).

6.      Does 1 - 19 are physicians, and possibly a nurse practitioner, who provide(d) services on behalf of CNOS, PC and many of which are owners of CNOS, LLC.

7.      Defendant, CNOS, PC is an Iowa Corporation whose principal place of business is located in the State of South Dakota and who employs or contracts for the services of Does 1 - 19.

8.      Defendant CNOS Holding Co., LLC (hereinafter referred to as CNOS, LLC) is an Iowa Limited Liability Company which has its principal place of business in the State of South Dakota and which owns a building and most of the equipment utilized by CNOS, PC.

9.      Defendant Stryker Sales Corporation (hereinafter referred to as "Stryker Sales" or "Stryker") is a Michigan Corporation which at all times was qualified to do business in the States of South Dakota and Iowa in the sales and distribution of orthopedic products and which the Relator states on information and belief is a subsidiary of the Stryker Corporation which is also a Michigan Corporation.

10.     Siouxland Surgery Center Limited Partnership (hereinafter "Siouxland Surgical") is an Iowa Limited Partnership which operates as an ambulatory surgical center and has its principal place of business in Dakota Dunes, South Dakota.

11.     Dr. Michael C. Genoff ("Dr. Genoff") is a physician employee/owner who

provides services on behalf of CNOS, PC and is an owner of CNOS, LLC

## FACTS

## RELATOR'S RELATIONSHIP TO CNOS, LLC, CNOS, PC, AND DOES 1 - 19

12.     From approximately January 1, 1999 to through April 1, 2004, Relator acted as an employee of CNOS, PC

13.     CNOS, PC employs physicians, or contracts with them, for the provision of medical services.

14.     At various times during the years 1999 through December 2002 the Relator acted in the capacity of a member of the Board of Directors for CNOS, LLC.

15.     The Relator brings this action based on his direct, independent and personal knowledge, and also on information and belief based upon information relayed to him in the course and scope of his employment.

16.     Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based.

## THE RELATIONSHIP BETWEEN THE DEFENDANTS

17.     Defendant CNOS, LLC owns a majority interest and the Relator states on information and belief that CNOS, LLC, and/or its members, hold an interest in the general partner of Siouxland Surgical which is S. S. C. Development, Inc.

18.     Siouxland Surgical is used primarily, but not exclusively, by physicians who are

employees or contracted physicians of CNOS, PC and most, or all of whom, hold an ownership interest in CNOS, LLC.

19.     The employee physicians and contracted physicians who work for CNOS, PC provide services and order certain tests which are reimbursed through Medicare.

20.     The United States of America ("U.S.") funds certain tests and procedures through Medicare and those tests and procedures are ordered, performed, and/or billed by agents of CNOS, PC, CNOS, LLC, and Siouxland Surgical.

21.     Said procedures are performed utilizing the facilities and equipment that belong to CNOS, LLC, and at times Siouxland Surgical, and the profits from these procedures go to CNOS, PC, CNOS, LLC, and Siouxland Surgical.

## THE FALSE CERTIFICATION AND ILLEGAL KICKBACK SCHEME TO INCREASE DEXASCAN REIMBURSEMENT

22.     One test that is funded by the U.S., and ordered by the physician or other employees of CNOS, PC, is a Dexascan.

23.     The physicians who order a Dexascan have a legal obligation to certify, in their capacity as treating physicians, its medical necessity.

24.     Physicians may only order such testing if they personally verify it as being medically necessary, and reasonable and necessary, through the course of their patient treatment. See generally 42 C.F.R. 410.32(a)((citing 411.15(k)(1)).

25.     During the course of his employment Relator learned that the CNOS Defendants were instituting a program (the "Dex Scheme") which encouraged and allowed non-physician

employees to insert factually inaccurate representations into the medical records in order to meet the requirements of Medicare to order certain testing.

26.     The Dex Scheme was accomplished by Physicians who would sign an agreement, a copy of which is attached hereto as Exhibit A, pursuant to which their R.N. would be delegated authority to insert false representations as to the medical necessity of a Dexascan into the medical records of the physician.

27.     CNOS, PC had knowledge that a nurse could not be the referring provider as evidenced by the first sentence of the "Proposal for Dexascan Referrals at CNOS" which is attached hereto as Exhibit A.

28.     That the purported evaluations, judgements, and determinations inserted into the medical records were not made by the physician signing, and thereby certifying to the veracity of, such records.

29.     That said medical certification was entered electronically *after* the meeting with the patient and *without* the physician's direction. As such the physician never created or saw the certification nor made the required findings to order said testing or to find the testing to be reasonable and necessary.

30.     The Dex Scheme is contrary to state and federal law and specifically vitiates the requirement of certification as to medical necessity which is required under the Medicare Program for purposes of reimbursement.

31.     Based upon said false certification a Dexascan would be set up by the nurses working for the CNOS, PC physicians, and performed utilizing the equipment of CNOS, LLC by a L.P.N. employed or contracted by CNOS, PC.

Page -7-

32.     As part of the Dex Scheme an incentive or reward was offered pursuant to which the R.N. who inserted the most fraudulent entries into the medical records (i.e. falsely certified the medical necessity of the most Dexascans) would receive a reward.

33.     The Relator states on information and belief that the Dex Scheme resulted in a substantial increase in the utilization of the Dexascan tests which are funded by the U.S. as a portion of the Medicare program and also by the Medicaid program which is a state implemented program funded by the U.S.

34.     The Relator states on information and belief that the Dex Scheme was so financially successful for Defendants that, ultimately, all of the participating R.N.'s were given rewards for the increase in the volume of tests which were ordered.

35.     The Relator believes the Dex Scheme violates the A.K.S. and F.C.A.

36.     The Relator states on information and belief that form 1500's, or comparable claim forms for the tests, were submitted to the U.S. through the Defendants individually, or their authorized third party administrators, in order to obtain payment for said tests and procedures.

37.     The Relator states on information and belief that the manner in which these were ordered and certified, and the reward for the volume ordered, under the Dex Scheme resulted in said forms constituting false or fraudulent claims under the F.C.A.

### THE ILLEGAL KICKBACKS IN THE FORM OF LEASE PAYMENTS AND OTHER "PERKS" FROM STRYKER TO DOES 1 - 19 AND THE CNOS ENTITIES TO IMPACT REFERRALS TO, AND UTILIZATION BY, SIOUXLAND SURGICAL

38.     In the course of the Relator's employment he also became aware of a certain lease arrangement between CNOS, LLC and Stryker Sales and other perks provided to the CNOS, PC

employees and contracted physicians by Stryker Sales.

39.     Stryker Sales provides instruments such as drills, saws, artificial joints, rods, screws, and bone cements which are purchased Siouxland Surgical and utilized by CNOS, PC employees and contracted physicians for, among other things, total knee and hip replacements.

40.     The sales representative for Stryker Sales is Mike Boose.  He visits physicians and works to encourage the utilization the Stryker Sales' products.

41.     In 1999 or 2000 certain corporate executives from Stryker Sales met with the Board of Directors of CNOS, LLC to discuss ways in which Stryker could "help" CNOS, LLC. and CNOS, PC.

42.     The executives suggested that CNOS, LLC lease a room to Stryker consisting of approximately one thousand six hundred (1,600) square feet for trade shows and speaker programs in exchange for Thirty Thousand Dollars ($30,000.00) per year.

43.     The payment which the Relator believes was made for said room was, in actuality, an incentive, or remuneration, for Siouxland Surgical, an entity controlled by CNOS, LLC, to purchase, and to pressure CNOS, PC employees to utilize, the products of Stryker Sales and not for trade shows and speaker programs.

44.     In fact, said room was utilized as a storage area by CNOS, LLC and CNOS, PC and thus it appears Stryker received nothing in terms of leased space for said payment(s).

45.     The Relator states on information and belief that said payments were actually intended to induce, and did induce, the utilization of the products Stryker sells to Siouxland Surgical.  Further, the payments induced the ordering of Stryker products by the employees of CNOS, PC for use at Siouxland Surgical where CNOS, LLC or its agents held a controlling

interest and could control which products were utilized.

46.     In fact, on one occasion, the Relator failed to utilize Stryker products and scheduled three full knee replacements at Siouxland Surgical but, because he was not utilizing Stryker Sales' products, a CNOS, LLC Board Member called the CEO of Siouxland Surgical and had said individual cancel the Relator's surgeries.  The Relator rescheduled the surgeries at a separate facility.

47.     On another occasion, when the Relator was on the Board of a local hospital and was attempting to negotiate a lower cost of the products sold by Stryker, he was told by CNOS, LLC members that neither CNOS entity would work to lower the prices charged for Stryker products.

48.     The Relator states on information and belief that this has led to an inflated price for the products sold by Stryker within the region in and around the Dakota Dunes and the utilization of Stryker products based upon improper considerations.

49.     The Relator states on information and belief that eight (8) of the ten (10) orthopedic surgeons working for CNOS, PC at the time he was employed, and a number of the non-orthopedic physicians, utilized predominately Stryker Sales' products during the time the "rental" payments were being made by Stryker.

50.     The realtor states on information and belief that said payments for rental space are in violation of the Federal Anti-Kickback law and also violate the False Claims Act.

51.     Stryker has also provided certain lavish hunting, fishing, and seminar or research trips, consulting and research agreements, and other perks and financial benefits to the physicians of Stryker which the Relator states on information and belief were intended to induce referrals to

Siouxland Surgical for the utilization of Stryker products.

52.     The Relator states on information and belief that Siouxland Surgical submitted claims pursuant to form 1500's or similar forms that included payment for products supplied by Stryker pursuant to the illegal arrangements.  CNOS, PC and/or CNOS submitted form 1500 or similar forms for claims to the U.S. which included charges for services provided utilizing Stryker products.

53.     The Realtor states on information and belief that the safe harbor provided physicians under federal Law, and specifically under STARK, are not applicable if the relationship violates the A.K.S. statute and charges cannot be made to the U.S. for services which are in violation of STARK.

54.     The Relator states on information and belief that, as a result of the payments to induce the purchase and charges for the Stryker supplies, the subsequent payment requests for procedures utilizing Stryker products were rendered false or fraudulent under the F.C.A.

## FALSE AND FRAUDULENT CLAIMS SUBMITTED, AND UNNECESSARY PROCEDURES PROVIDED, BY DR. GENOFF

55.     In the course of his employment the Relator was advised, though he cannot verify that it has been the case in every situation, that Dr. Genoff was providing unnecessary medical services resulting in increased charges to the U.S.

56.     Specifically, the Relator was informed that Dr. Genoff  was performing wrist flexor synovectomys on all of his carpal tunnel cases.

57.     When his opinion was requested the Relator advised that these were unnecessary procedures.

58.     The Relator states on information and belief that this procedure is only necessary in less than ten percent (10%) of carpal tunnel procedures.

59.     Further, during the time period when this unnecessary procedure occurred, the additional procedure added approximately two hundred and fifty dollars ($250.00) to the charge under Medicare.  That the Relator believes that the rules may have subsequently changed so that there is no additional charge allowed for this procedure.

60.     Relator states further that Dr. Genoff performs certain surgeries utilizing a P.A. as a surgical assistant.

61.     Dr. Genoff is married to Dr. Formosa, who is also employed by CNOS, PC or is a contract physician for CNOS, PC.

62.     The Relator states on information and belief that on a number of occasions where a P.A. assisted Dr. Genoff on his surgeries that, instead of showing assistance by the P.A., he showed Dr. Formosa, an M.D., as providing the surgical assistance which fraudulently increases the amount of the charge to the U.S.

63.     That office visits to Orthopedic surgeons are coded based upon the nature and complexity of the patient's condition.

64.     Depending on the complexity of the case the patient will be coded as a 1 through a 5 with the 5 generating the maximum charge to Medicare.

65.     Relator states on information and belief that Dr. Genoff has consistently billed 5's and that said billings are not consistent with the nature of the consultations provided.

66.     Relator states on information and belief that CNOS, PC, CNOS, LLC, and Siouxland Surgical had actual knowledge of Dr. Genoff's conduct and, at least one entity has

addressed the issue with him, but the conduct has continued.

67.     Relator states on information and belief that despite said knowledge CNOS, PC and/or CNOS, LLC and Siouxland Surgical submitted claims for such services which, by virtue or said conduct, were false or fraudulent under the F.C.A.

68.     Said claims were a precedent to payment by the U.S. for services, which payment would not have been made if the U.S. knew of the above facts.

69.     The actions of Dr. Genoff subject him to liability under the F.C.A., under the provisions which include but are not necessarily limited to, 31 USC 3729(a)(1)(2)(3) and also subject CNOS, PC and/or CNOS, LLC, and Siouxland Surgical to liability under the same statutes based upon the false and/or fraudulent submissions or claims which were subsequently submitted to the U.S. for payment.

70.     By virtue of being a participant in the Medicare program one implicitly certifies to compliance with all laws, rules, and regulations governing said program.

71.     Any person or entity who submits the form 1500 or uniform bill, attached hereto as Exhibit B, explicitly certifies to the representations contained therein.

72.     The Relator states on information and belief that CNOS, PC, the Doe Defendants, Dr. Genoff, and CNOS, LLC submitted form 1500's, or equivalent forms, and that Siouxland Surgical submitted uniform bills, or equivalent forms, for the services provided by Dr. Genoff and certain Doe Defendants knowing said claims were false or fraudulent, or with reckless disregard as to the false or fraudulent nature of the claims, in violation of the F.C.A.

## FALSE AND FRAUDULENT CLAIMS SUBMITTED BY THE CNOS ENTITIES BASED UPON IMPROPERLY CODED "CONSULTS" BY DR. GENOFF AND DOES 1 - 19

73.     The Relator further believes that the CNOS entities, Dr. Genoff, and certain of the Does 1 - 19 have improperly coded visits with patients who were transferred to their care as "consults" for the purpose of increasing the charges to Medicare.

74.     This belief is based upon certain discussions that the CNOS entities had with their billing advisors and the Medicare Carriers Manual § 15506 which addresses "consultations." This provision states that "Medicare will pay for an initial consultation if all the criteria for a consultation are satisfied.  Payment may be made regardless of treatment initiation unless a transfer of care occurs.  A transfer of care occurs when the referring physician transfers the responsibility for the patient's complete care to the receiving physician at the time of referral, and the receiving physician documents approval of care in advance."

75.     Under the guidelines when a transfer of care occurs the patient encounter should be coded as a new or established patient visit and not as a "consult."

76.     Because of the nature of the services provided, a transfer of care frequently took place upon the referral to the CNOS entities and their agents.

77.     However, in order to get the higher paying "consult" code the CNOS entities, Dr. Genoff, and certain or all of the Does 1 - 19 fraudulently and routinely documented the transfers as consults.

78.     The Relator states on information and belief that CNOS, PC, the Doe Defendants, Dr. Genoff, and CNOS, LLC submitted form 1500's, or equivalent forms, for the services which

were improperly coded as "consults" knowing said claims were false or fraudulent, or with reckless disregard as to the false or fraudulent nature of the claims, in violation of the F.C.A.

## COUNT I: FALSE CERTIFICATION: CNOS, LLC, CNOS, PC, DR. GENOFF, AND DOES 1 - 19

79.     The Relator restates the preceding paragraphs as though set forth in full herein.

80.     That in January of 1999 the Office of the Inspector General issued a "**SPECIAL FRAUD ALERT**" (the "Certification Fraud Alert") placing physician and physician practice groups on notice of the dangers and ramifications of false certification as to medical necessity. Please see "Exhibit C."

81.     The Certification Fraud Alert advised that "In determining what services are medically necessary, Medicare primarily relies on the professional judgement of the beneficiaries treating physician, since he or she knows the patient's history and makes critical decisions, such as admitting the patient to the hospital: *ordering tests*. . ."

82.     Contained in the Certification Fraud Alert is a warning that "Physicians should be aware that they are subject to substantial criminal, civil, and administrative penalties if they sign a certification knowing that the information relating to medical necessity is false, or with reckless disregards as to the truth of the information being submitted."

83.     To this end physicians are advised in bold print that "**If a physician has any questions as to the application of these requirements to specific facts, the physician should contact that appropriate Medical Fiscal Intermediary or Carrier.**"

84.     Instead of contacting the appropriate fiscal intermediary CNOS, PC, acting

through its agents and/or third party administrators, CNOS, LLC, and any Doe or named Defendants who submitted the form attached hereto as "Exhibit A," created the Dex Scheme and provided falsified medical records certifying that certain patients met the requirements for the provision of a Dexascan to justify the ordering of said tests.

85.     Said certification is a prerequisite to payment under Medicare or Medicaid.

86.     The Doe and other Defendant's who participated in the Dex Scheme will be determined in the course and scope of discovery.

87.     Federal law limits the persons who can certify to the medical necessity and need for Dexascans.

88.     The R.N.'s who inserted the certifications into the medical records of the Doe Defendants are not authorized to make such determinations.

89.     The Dex Scheme led to the submission of claims for payment for services by CNOS, PC and/or CNOS, LLC for services and equipment utilized as part of the Dexascan procedure.

90.     Those submissions were falsely certified and actually and impliedly constitute false certification under federal law and subject C.N.O.S., PC, CNOS, LLC, and any of the Doe defendants who signed said forms, to liability under 31 U.S.C. §§ 3729(a)(1)(2)(3).

91.     As a result of the Dex Scheme the U.S. was damaged in an amount to be determined at trial and the Plaintiffs are entitled to recoup any sums paid for said falsely certified claims along with statutory costs, damages, and penalties resulting from said submissions.

## COUNT II: VIOLATION OF THE ANTI-KICKBACK PROVISIONS RESULTING IN LIABILITY AS TO ALL DEFENDANTS UNDER THE FALSE CLAIMS ACT

92.    The Relator restates the preceding paragraphs as though set forth in full herein.

93.    That on October 2, 1997 the Office of the Inspector General placed a letter opinion on its regulatory website explaining that provision of goods or services for less than market value could constitute an illegal kickback under Federal law.  Please see a copy attached hereto as "Exhibit D (the Anti-Kickback/False Claim Opinion)."

94.    That the Antikickback/False Claim Opinion noted that "in addition to potential criminal liability under the anti-kickback statute, there is legal authority that any claim tainted by a kickback arrangement is a "false or fraudulent" claim under the Federal False Claims Act, 31 U.S.C. § 3729 **citing** U.S. ex rel. Pogue v. American Healthcorp., Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996).

95.    That in February of 2000 the Office of the Inspector General issued a Special Fraud Alert regarding the "Rental of Space in Physician Offices by Persons or Entities to Which Physicians Refer" (the "Rental Fraud Alert").  Please see a copy attached hereto as "Exhibit E."

96.    That the Rental Fraud Alert discussed and gave notice of concerns about certain arrangements which could be used to disguise kickbacks including "suppliers of durable medical equipment, prosthetics, orthotics and supplies (DMEPOS) that set up "consignment closets" for their supplies in physician offices.

97.    The Rental Fraud Alert advised of the dangers of kickbacks in that it can "distort medical decision-making, cause overutilization, increase costs and result in unfair competition by freezing out competitors who are unwilling to pay kickbacks."

98.     The Rental Fraud Alert noted that "Kickbacks can also adversely affect the quality

of patient care by encouraging physicians to order services or recommend supplies based on

profit rather than the patients' best medical interests."

99.     The Rental Fraud Alert put physicians and their groups on notice that "both

parties to an impermissible transaction are liable," and that such transactions are illegal.

100.     Section 1320a of Title 42 prohibits the willful soliciting, receiving, offering or

paying anything of value to induce referrals of items or services payable by a federal health care

program and violations of the same result in liability for both parties to the transaction.

101.     The Federal Government has a statutory lien on any reimbursement from a third

party for services billed through Medicare and providers are required to remit the same within

sixty (60) days of receipt.

102.     The Relator states on information and belief that no reimbursements have been

made to the U.S. for receipt of the benefits from Stryker resulting from utilization of its products

in services billed through Medicare.

103.     31 U.S.C. §3729(a)(4)(7) requires that property which rightly belongs or is owed

to the U.S. be remitted and failure to do so results in liability under the F.C.A.

104.     Section 1320a applies to transactions where one purpose of the arrangement is to

induce the utilization of goods or services.

105.     Certain conduct violating the A.K.S. is actionable under the False Claims Act.

## STRYKER'S REMUNERATION TO INDUCE REFERRALS TO SIOUXLAND SURGICAL BY CNOS, P.C. AND CNOS, LLC, DR. GENOFF, AND DOES 1-19

106.    The Relator states on information and belief that Stryker Sales and CNOS, LLC and/or CNOS, PC entered into an arrangement whereby CNOS, LLC and/or CNOS, PC were given annual payments in the amount of Thirty Thousand Dollars ($30,000.00) for the utilization of space in the building owned by CNOS, LLC.

107.    In fact said space was never utilized by Stryker Sales but rather CNOS, LLC and/or CNOS, PC continued to utilize said space despite receiving payments for the utilization of the same.

108.    As a result thereof CNOS, LLC and/or CNOS, PC illegally encouraged and induced its treating physicians and those who utilized their services to utilize the Stryker products in part due to the lease payments and other remuneration provided by Stryker.

109.    That because said arrangement violated the F.C.A. the federal physician self referral laws were violated under STARK.

110.    Under STARK no payment can be made by the U.S. for services provided in violation of the self referral rules. The referral by physicians of patients to institutions in which they hold, directly or indirectly, and ownership interest is prohibited under applicable statute unless they fall within a "safe harbor."

111.    A safe harbor is provided for ownership in ambulatory surgical centers, such as Siouxland Surgical, but it is not applicable if the arrangement constitutes a kickback under federal law.

112.    The Relator states on information and belief that patients are referred to Siouxland

Surgical by agents of CNOS, PC pursuant to the improper remuneration more fully delineated above.

113. Accordingly, each of the claims submitted by Siouxland Surgical and CNOS, PC and/or CNOS LLC, relating to or including charges for the Stryker products, are rendered false and/or fraudulent under the F.C.A.

## THE DEX SCHEME KICKBACK

114. CNOS, PC also entered into the Dex Scheme whereby incentive payments were made to the R.N. who falsified the most medical records to maximize the claims submitted to Medicare for payment of Dexascans.

115. CNOS, LLC was a party to this arrangement as the recipient of benefits in the form of increased service charges for the Dexascans.

116. CNOS, LLC, CNOS, PC. and certain Doe Defendants induced, encouraged, and facilitated the submission of false claims by virtue the remunerations made to CNOS, LLC, CNOS, PC and certain Doe Defendants, the details of which shall be ascertained in the course of discovery.

117. The Relator states on information and belief that the arrangement resulted in the increased utilization of the Dexascan which procedure is paid for by the U.S.

118. Payment is made for both the utilization of the equipment and the "read" of the scan. The Relator states on information and belief that the "read" would be paid to the employed Nurse Practitioner of CNOS, PC and the equipment charge would go to CNOS, LLC.

119. That, because these charges were generated as the result of an unlawful kickback the charges relating thereto are rendered false or fraudulent under the F.C.A.

120.    As a result of this conduct the U.S. was damaged in an amount to be determined at trial and the Plaintiffs are entitled to recoup any sums paid as a result of the Dex Scheme and the Stryker payments along with statutory damages, costs, and penalties resulting from said submissions.

## COUNT III: FALSE AND/OR IMPROPER BILLINGS, CERTIFICATIONS, AND REPRESENTATIONS BY DR. GENOFF AND CERTAIN DOE DEFENDANTS RESULTING IN THE PRESENTATION OF FALSE CLAIMS BY CNOS, LLC, CNOS, P.C., AND SIOUXLAND SURGICAL

121.    The Relator realleges the preceding paragraphs as though set forth in full herein.

122.    The Relator states on information and belief that Dr. Genoff has engaged in the performance of unnecessary and inappropriate procedures resulting in the submission of false claims by CNOS, LLC and/or CNOS, PC and Siouxland Surgical.

123.    The Relator states on information and belief that the Dr. Genoff has entered codes beyond those which were appropriate or justified for office visits with patients.

124.    The Relator states on information and belief that Dr. Genoff and/or one of the Doe Defendants, in coordination with CNOS, PC and/or CNOS, LLC and Siouxland Surgical have submitted billings for assists on procedures which indicate a physician, rather than a physician assistant, provided said services when, in fact, a P.A. provided said assist.

125.    On information and belief said conduct was performed in the course and scope of Dr. Genoff's employment with CNOS, PC and that CNOS, PC, CNOS, LLC, and Siouxland Surgical had actual and constructive notice that said conduct was occurring.

126.    The Relator states on information and belief that, as a result of Dr. Genoff's acts,

CNOS, PC and/or CNOS, LLC and Siouxland Surgical submitted claims under Medicare and

Medicaid which they knew of should have known were improper.

127.    The conduct of Dr. Genoff, CNOS, LLC, and CNOS, PC is false or fraudulent in

violation of the False Claims Act and, specifically, 31 U.S.C. §§ 3729(a)(1)(2).

128.    The submitted claims were  precedent to payment by the U.S. and the same would

not have been paid if the U.S. had known the facts delineated above.

129.    That as a result of these claims the U.S. was damaged in an amount to be

determined at trial and the Plaintiffs are entitled to recoup any sums paid for said falsely certified

claims along with statutory damages, costs, and penalties resulting from said submissions.


## COUNT IV: FALSE CLAIMS RESULTING FROM THE FRAUDULENT CODING OF CONSULTS AS TO THE CNOS ENTITIES, DR. GENOFF AND DOES 1 - 19.

130.    The Relator realleges the preceding paragraphs as though set forth in full herein.

131.    That the improper coding of patients whose care has been transferred to the CNOS

Entities, Dr. Genoff, and Does 1 - 19 resulted in the submission of form 1500, or similar forms

by the said entities which documents were fraudulent because of the misrepresentations therein.

132.    That said submission was a precedent of payment from the U.S. and the

submissions would not have been paid but for the fraudulent representations contained within

them.

133.    That as a result of these claims the U.S. was damaged in an amount to be

determined at trial and the Plaintiffs are entitled to recoup any sums paid for said falsely certified claims along with statutory damages, costs, and penalties resulting from said submissions.

## COUNT V:  CONSPIRACY TO SUBMIT FALSE CLAIMS AS TO ALL DEFENDANTS

134.    That the Relator restates the preceding paragraphs as though set forth in full herein.

135.    That CNOS, LLC, CNOS, PC, Siouxland Surgical, the Doe Defendants, and Dr. Genoff acted overtly to the further conspiracy as set forth above in ways including, but not limited to:

    a.    submitting false or fraudulently certified claims to the U.S.;

    b.    entering into a scheme to create false records certifying medical necessity;

    c.    providing unnecessary services and improperly increasing charges through coding and the submission of claims to the U.S. pursuant to this conduct; and

    d.    offering and accepting remuneration to induce utilization and referrals.

136.    Defendants combined, conspired, and agreed together to defraud the U.S. by knowingly submitting false claims to the U.S. and to its grantees for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. 3729(a)(3), causing damage to the United States.

**WHEREFORE the Relator respectfully requests relief against the Defendants as named in counts 1 through 5 above  jointly and severally as follows:**

1.    That the U.S. be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint as the Civil False Claims Act 31 U.S.C. Sections 3729 *et seq.* provides;

2.    That civil penalties of Eleven Thousand Dollars ($11,000.00) be imposed for each and every false claim that the Defendants presented to the U.S. and/or its grantees;

3.    That pre and post judgment interest be awarded, along with the reasonable attorneys' fees, costs, and expenses for the bringing of this action;

4.    That the Court grant permanent injunctive relief to prevent the recurrence of any violations of the False Claims Act which are alleged in this complaint;

5.    That following discovery the Plaintiffs be allowed to Amend the Complaint to insert the Does which are found to have participated in the conduct described in the Plaintiffs' Complaint.

6.    That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

7.    That the Court award such other and further relief as it deems proper.

Dated this 16th day of July, 2004.

CADWELL SANFORD DEIBERT & GARRY

By _____

Brett A. Lovrien
Steven W. Sanford
Shawn M. Nichols
200 E. 10th Street, Suite 200
Sioux Falls, South Dakota 57104
Telephone: (605) 336-0828
Telecopier: (605) 336-6036

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

CADWELL SANFORD DEIBERT & GARRY

By _____
Brett A. Lovrien
Steven W. Sanford
Shawn M. Nichols

## VERIFICATION

STATE OF SOUTH DAKOTA  )
                       : SS
COUNTY OF MINNEHAHA    )

Spencer Greendyke, M.D., being first duly sworn, upon his oath deposes and states that he is the Plaintiff in the above and foregoing Verified Complaint, that he has read said complaint and knows the contents thereof, and that the statements therein contained are true and correct of his own knowledge and belief.

Dated this 16th day of July, 2004.

_____
Spencer Greendyke, M.D.

Subscribed and sworn to before me this 16th day of July, 2004.

_____
Notary Public - South Dakota
My Commission Expires: 03/13/2009

(SEAL)